# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| 3137, LLC, 541 MAIN STREET REALTY TRUST, EMBER PIZZA, INC., THE PORT RESTAURANT AND BAR, INC., JUSTIN R. BRACKETT, and JARED G. BRACKETT, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 21-cv-10473-DJC |
| TOWN of HARWICH, et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                    **January 28, 2022**

## I.  Introduction

Plaintiffs 3137, LLC, 541 Main Street Realty Trust, Ember Pizza, Inc. ("Ember"), The Port Restaurant and Bar, Inc. ("The Port"), Justin Brackett and Jared Brackett (collectively, "Plaintiffs") have filed this lawsuit against Defendants Town of Harwich, Joseph F. Powers, David J. Guillemette, Kevin M. Considine, Michael D. Macaskill, Larry G. Ballantine, Donald F. Howell, Edward J. McManus, Stephen P. Ford[1] (collectively, "Town"), Gail O. Sluis ("Sluis"), Patricia A. O'Neill ("O'Neill"), and Does 1-10 (collectively, "Defendants"), asserting violations of their First and Fourteenth Amendment rights (Count I), the Massachusetts Civil Rights Act ("MCRA") and state constitutional rights (Counts II and III), intentional interference with contractual and economic relations (Count IV), common law conspiracy (Count V) and defamation (Count VI) in

---

[1] Defendants notified the Court that Stephen P. Ford passed away on April 9, 2021.  D. 26.

connection with the Town's enforcement of its Noise Ordinance ("Ordinance") and the state's COVID-19 restrictions.  D. 37.  The Town defendants and Sluis have moved to dismiss.  D. 58; D. 60.  For the reasons discussed below, the Court ALLOWS the motions.

## II.    Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  García-Catalán, 734 F.3d at 103 (citation omitted).

## III.    Factual Background

The following facts are drawn from the amended complaint, D. 37, and documents referenced therein, and the Court assumes the well-pled facts to be true for the purpose of resolving the motions to dismiss.[2]

---

[2] Both motions seek dismissal on the basis that Plaintiffs have failed to comply with the pleading requirements set forth in Fed. R. Civ. P. 8.  See D. 59 at 29; D. 61 at 5.  As noted above, the Court only has considered the alleged facts that are well-pled and has "ignore[d] statements in the complaint that simply offer legal labels and conclusions."  Schatz, 669 F.3d at 55.  Accordingly, dismissal on Rule 8 grounds is not warranted.

A. **The Port and Ember**

The Port and Ember are restaurants in Harwich, Massachusetts.  D. 37 ¶ 37.  Both restaurants have previously held a liquor license granted annually (or seasonally) by the Harwich Board of Selectmen ("Board") and approved by the Massachusetts Alcoholic Beverages Control Commission ("ABCC").  Id.  Both restaurants have also held an entertainment license, which allows them to play music (amplified or acoustic) indoors and outdoors, at certain times.  Id. ¶ 39.

B. **Ordinance Violations and Discipline**

Harwich's Ordinance provides, in relevant part, that, "[i]t shall be unlawful for any person or persons to cause or allow any noise which emanates from any building, boat, structure, vehicle, premises, or any sound amplification system, which is plainly audible at a distance of 150 feet from any such building, boat, structure, vehicle, premises or sound amplification system."  Id. ¶ 42; D.  37-3 at 1.  Plainly audible noise "constitute[s] prima facie evidence of a violation."  Id.  The Ordinance defines "plainly audible" as "[a]ny sound from a source regulated by this bylaw that can be detected above routine or normal ambient background noise by unaided human hearing."  Id. ¶ 44.

In June 2019, following increased noise complaints, the Town established a seven-member noise committee, which originally included an employee of Sluis' restaurant but no representative from Plaintiffs' restaurants.  Id. ¶ 67.  A representative from one of Plaintiffs' restaurants was later added to the committee but the noise committee was disbanded shortly after his appointment.  Id. ¶ 68.

Plaintiffs allege that false noise complaints against Ember were called into Harwich Police, orchestrated by the owner of Perks, a competitor, and that the Town selectively enforced the Ordinance and lacked a written policy for same.  Id. ¶¶ 57, 69-70, 72.  In September 2019, the

Town Administrator issued findings that four of the complaints showed a violation of the Ordinance.  Id. ¶ 69.  On October 28, 2019, the Board voted to suspend Ember's entertainment license for two days, and limited Ember's entertainment license on five additional days to acoustic only performances.  Id. ¶ 70.  At that meeting, the Board indicated that "there will be a second hearing for . . . additional violations."  D. 37-11 at 3-4.  On February 27, 2020, the Town Administrator held a further hearing to address the violations, where Town counsel Gregg Corbo ("Corbo") advised the Board on hearing procedure and presented the Town's case against Ember. D. 37 ¶¶ 73-74.  On August 3, 2020, in light of additional Ordinance violations and the fact that Plaintiffs did not serve at least some of their prior suspension in summer 2020 (due to the pandemic), the Board voted to rescind its prior discipline and impose a seven-day suspension of Ember's entertainment license covering all the 2019 Ordinance violations.  Id. ¶ 90; D. 37-31. Plaintiffs allege that the seven-day suspension was erroneously imposed and failed to consider its responses to the underlying violation reports.  D. 37 ¶ 90.  At the same meeting, the Board voted to suspend Perks' entertainment license for one day, despite three written warnings, one unconfirmed violation, five confirmed violations between 2016 and 2018, and two confirmed violations in 2019.  Id. ¶ 91.  On August 13, 2020, the Board imposed the suspension of Ember's entertainment license.  Id.  ¶ 72.  Ember did not receive any noise complaints in 2020.  Id.

C.    **COVID-19 Restrictions**

By May 2020, Massachusetts COVID-19 guidance allowed restaurants to remain open for takeout food and alcohol sales.  Id. ¶ 76.  On May 28, 2020, the Harwich Police Deputy Chief referred several alleged violations of the guidance by The Port and Ember to the Town.  Id. ¶ 78; D. 37-16.   Plaintiffs allege that these violations were unsupported by the narratives of Harwich police investigating the violations.  Id. ¶ 78.  Plaintiffs further allege that the Town did not

discipline other establishments for violating the state restrictions by allowing alcohol consumption on-premises and hosting live entertainment.  See id. ¶¶ 76-79.

In July 2020, Harwich restaurants were allowed to seat patrons outside and patrons could consume alcohol so long as they were served by wait staff and food was available for purchase. Id. ¶ 80.  On July 10, 2020, a Harwich Police officer accused The Port of allowing a patron to exit the restaurant with an open container of alcohol and demanded that The Port install a doorman every night of the summer.  Id. ¶ 81.  Plaintiffs allege that the "offending can of alcohol" was sold by Perks.  Id.  ¶ 82.  The Port filed a complaint about the incident with the Harwich Police Department, but no action was taken.  Id. ¶ 83.  Six days after Plaintiffs filed the complaint, on July 16 and 17, 2020, three investigators from the ABCC visited The Port and claimed that it had violated the State's "phase 2" COVID-19 guidance, although The Port alleges it was then operating under "phase 3" guidance.  Id. ¶ 86; D. 37-37 at 42-43.  Plaintiffs allege that ABCC investigators did not visit any other licensed establishment in the Town at that time.  D. 37 ¶ 86.

    D.    **Board Hearings**

On August 12, 2020, the Board held a remote disciplinary hearing regarding Plaintiffs' alleged COVID-19 violations that was subsequently suspended due to technical difficulties.  Id. ¶¶ 92-93.  At the hearing, Corbo advised the Board on questions of procedure and evidence and led direct examination of witnesses.  Id. ¶ 93.  The hearing was continued until January 12, 2021, despite Plaintiffs and their counsel being unavailable.  Id. ¶¶ 97-98.

Meanwhile, Plaintiffs had applied to renew their entertainment license from the Town in November 2020.  Id. ¶ 96.  On February 21, 2021, the Board approved entertainment licenses for other establishments, but not Plaintiffs' restaurants.  Id. ¶ 100.  The Board declined to vote on the renewal pending the results of the Board's hearing related to the alleged COVID-19 guidance

violations.  Id. ¶ 101.  On February 8, 2021, the Town Administrator submitted findings to the Board, prepared by Corbo, and such findings were sent to Plaintiffs on February 11, 2021.  Id. ¶ 102.  The Board scheduled a public hearing for February 16, 2021.  Id.  Then, a public hearing was scheduled for March 21, 2021 but continued while the Board sought advice regarding potential conflicts of interest that it believed were created by ongoing litigation between Plaintiffs and the Town, including this lawsuit.  D. 37 ¶ 105.  On April 23, 2021, Defendants' counsel represented that the State Ethics Commission had cleared the Board for a public hearing on April 26, 2021, but Plaintiffs have not been provided with any written determination of same.  Id. ¶ 108.

In advance of the April 26, 2021 hearing (and subsequent hearings), the Board allegedly refused to include certain documents and letters of support that Plaintiffs allege would refute the Town Administrator's prior findings.  Id. ¶ 114.  During the hearing, the Board stated that they had discussed with each other and with Harwich residents *ex parte* concerning outdoor noise complaints at Plaintiffs' restaurants, which was not previously disclosed to Plaintiffs.  Id. ¶ 115. The Police Chief similarly stated that he did not disclose any complaints he had received to Plaintiffs, but also did not refer any such complaints to the Board as Ordinance violations.  Id.  The Board then renewed Ember's liquor and entertainment licenses but imposed an acoustic-only restriction on Ember's entertainment license.  Id. ¶ 116.  On April 27, 2021, the Board held a public meeting where it revoked The Port's expanded outdoor dining permit, and Plaintiffs allege that the Board denied Plaintiffs' counsel the chance to meaningfully cross-examine adverse witnesses and refused to consider the full extent of Plaintiffs' proposed designs and improvements to accommodate its expanded outdoor dining.  Id. ¶ 117.  As a result of the revocation, The Port lost the deposit on its tent and had to refund deposits for six wedding reception reservations.  Id. ¶ 118. On May 10, 2021, the Board imposed the same acoustic-only restriction on The Port's 2021

entertainment license but did not impose the same on Perks despite Perks' two violations of the Ordinance in 2019.  Id. ¶ 120.  On May 12, 2021, the Board renewed The Port's liquor license, but suspended it for three days as discipline for the COVID-19 violations articulated in the Board's February findings.  Id. ¶ 121.

## IV.    Procedural History

Plaintiffs instituted this lawsuit on March 19, 2021.  D. 1.  Plaintiffs then moved for a preliminary injunction.  D. 7.  After the Court heard the parties on that motion, D. 31, the Court requested additional briefing from the parties on whether abstention from granting injunctive relief was required in light of ongoing state proceedings between the parties, D. 32.  Before such briefing was complete, Plaintiffs amended their complaint.[3]  D. 37.  The Town and Sluis have now moved to dismiss.  D. 58; D. 60.  The Court heard the parties on the pending motions and took this matter under advisement.  D. 72.

## V.    Discussion

### A.    Constitutional Claims (Count I)

Plaintiffs assert Count I against all Defendants for alleged violations of their First and Fourteenth Amendment rights, pursuant to 42 U.S.C. §§ 1983[4] and 1985.[5]

---

[3] The injunctive relief Plaintiffs originally requested, that the Town reinstate Plaintiffs' licenses for summer 2021, D. 7, is now moot in light of the Town granting the licenses, see D. 37 ¶¶ 116, 120-21, and to the extent that it seeks other relief, D. 7 at 15, it is denied as moot in light on this ruling on the motions to dismiss.

[4] Plaintiffs cannot assert a § 1983 claim against Sluis where the amended complaint does not plausibly allege that Sluis, a fellow restaurant owner and private citizen, acted "under color of law."  See Davignon v. Hodgson, 524 F.3d 91, 112 (1st Cir. 2008).

[5] To the extent Plaintiffs continue to press their § 1985 claim, see D. 65, they fail to state a claim because "a plaintiff may recover only when the conspiratorial conduct of which he complains is propelled by some racial, or perhaps otherwise class-based, invidiously discriminatory animus," Perkins v. City of Attleboro, 969 F. Supp. 2d 158, 178 (D. Mass. 2013) (quoting Aulson v.

1.      *First Amendment*

Plaintiffs allege that the Ordinance violates their First Amendment rights because it is overly broad and impermissibly vague.  D. 37 ¶¶ 143-45; D. 65 at 8.  To the extent Plaintiffs seek to mount a facial challenge to the Ordinance, they have failed to allege one.  "In the First Amendment context . . . a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  United States v. Stevens, 559 U.S. 460, 473 (2010) (internal citation and quotation marks omitted).  Here, Plaintiffs make no argument as to the constitutionality of any other application of the Ordinance, and thus have not plausibly alleged that the Ordinance is facially unconstitutional for its overbreadth.[6]  See Project Veritas Action Fund v. Rollins, 982 F.3d 813, 841 (1st Cir. 2020) (affirming dismissal where plaintiff did not point to other unconstitutional applications of statute).

In assessing Plaintiffs' challenge to the Ordinance as it applies to them, the Court first considers the appropriate level of scrutiny, which "turns on whether the restriction is content-based or content-neutral."  Martin v. Evans, 241 F. Supp. 3d 276, 287 (D. Mass. 2017) (citing Rideout v. Gardner, 838 F.3d 65, 71 (1st Cir. 2016)).  Here, the Court applies intermediate scrutiny.  The Ordinance is content-neutral as it regulates noise regardless of the underlying content of the noise (i.e., the message conveyed or the purpose of same).  See March v. Mills, 867 F.3d 46, 55-56, 64 (1st Cir. 2017) ( applying intermediate scrutiny and noting "it is well established that, even in

---

Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)), and here Plaintiffs do not allege racial or class-based discrimination.

[6] Plaintiffs instead assert that the Ordinance is overbroad because a business violates it "merely by operating, even without music, amplified or otherwise, as patron noise emanating from their outdoor patios is 'plainly audible' at distances greater than 150 feet from the establishment," and that the Ordinance "constitutes a complete ban on the use of amplified sound for any form of speech."  D. 65 at 9.  Even if this assertion were relevant to the overbreadth inquiry articulated above, there is no allegation in the amended complaint to support such an assertion.  See D. 37 ¶ 96.

public places, the government may enforce reasonable restrictions on the time, place, or manner of speech in order to protect persons from unduly burdensome noise").  Under intermediate scrutiny, the law must be "narrowly tailored to serve a significant governmental interest," but "need not be the least restrictive or least intrusive means of serving the government's interests." Rideout, 838 F.3d at 71–72 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)); McCullen v. Coakley, 573 U.S. 464, 486 (2014)) (internal quotation marks omitted).

The Supreme Court has held that governments have a "substantial interest in protecting its citizens from unwelcome noise . . . [which includes] even such traditional public forums as city streets and parks from excessive noise." Ward, 491 U.S. at 796 (citations omitted).  Turning to the narrow tailoring requirement, such consideration "is satisfied as long as the particular regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," Knights of Columbus, Council No. 94 v. Town of Lexington, 272 F.3d 25, 33 (1st Cir. 2001) (internal citation omitted).  Here, the substantial government interest in abating noise would be less effective in the absence of the Ordinance and it likewise leaves open alternative channels of communication because it does not prohibit all noise or music, just that which it defines as excessive.  In the context of music, at issue here, an individual or business may turn their outdoor music down or play music inside to not run afoul of the Ordinance.  See March, 867 F.3d at 68–69.  Plaintiffs assert that the Ordinance "does not leave open alternative channels of communication because music is 'plainly audible' at distances of more than 150 feet, whether amplified or not," D. 65 at 10, but have not alleged any facts as to this assertion.

To the extent Plaintiffs argue that the Ordinance fails intermediate scrutiny because it is vague, see id., they have also not plausibly alleged any facts as to same.[7]  Here, the Ordinance proscribes noise that is "plainly audible" to a listener at 150 feet, and Plaintiffs have not alleged any facts that challenge the objectiveness of this measure.[8]  Moreover, similar measures of excessive noise in municipal ordinances have been upheld and Plaintiffs do not contend with these arguments beyond their own interpretation of the Ordinance's definitions.  See Kovacs v. Cooper, 336 U.S. 77, 79 (1949) (holding that "loud and raucous," while "abstract" had "through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden"); March, 867 F.3d at 67 (rejecting argument that lack of specific decibel level in statute made it overly broad when statute proscribed excessive noise that could be "heard within a building"); Abrami v. Town of Amherst, No. 09-cv-30176-DPW, 2013 WL 3777070, at *15 (D. Mass. July 16, 2013) (concluding that noise ordinance specifying decibel levels was not constitutionally required, even if ordinance could include such measure and be written more precisely).

Accordingly, Plaintiffs have not plausibly stated a First Amendment claim.

### 2.    Fourteenth Amendment

Defendants next argue that Plaintiffs have failed to allege procedural and substantive due process claims.  D. 59 at 11-14.  Plaintiffs contend that the Town violated their due process rights by unlawfully delaying renewal of their liquor and entertainment licenses.  D. 65 at 12.

---

[7] A law may be "void for vagueness if its prohibitions are not clearly defined," thus violating due process.  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

[8] For support, Plaintiffs point to cautionary language from the Attorney General's review of the Ordinance, but that language pertains to a different subsection, dealing with "special permits," and is not related to the relevant portion of the Ordinance at issue here.  See D. 37-4 at 3.

a)     <u>Substantive Due Process</u>

"To establish a substantive due process claim, a plaintiff must demonstrate an 'abuse of government power that shocks the conscience' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.'"   <u>Coll. Hill Properties, LLC v. City of Worcester</u>, 135 F. Supp. 3d 10, 15 (D. Mass. 2015), <u>aff'd</u>, 821 F.3d 193 (1st Cir. 2016) (quoting <u>Collins v. Nuzzo</u>, 244 F.3d 246, 250 (1st Cir. 2001)).   Although the First Circuit routinely rejects substantive due process claims in the context of local licensing decisions, "it has 'left the door slightly ajar for federal relief in truly horrendous situations.'"   <u>Brockton Power LLC v. City of Brockton</u>, 948 F. Supp. 2d 48, 69 (D. Mass. 2013) (internal citation omitted); <u>Pagan v. Calderon</u>, 448 F.3d 16, 33 (1st Cir. 2006) (noting that the First Circuit has "held, with a regularity bordering on the monotonous, that the substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong").   The Town's acts therefore "must be 'truly outrageous, uncivilized, and intolerable,' . . . and 'the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error.'"   <u>Harron v. Town of Franklin</u>, 660 F.3d 531, 536 (1st Cir. 2011) (internal citation omitted).   The "test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."   <u>Id.</u> (internal citation omitted).   Moreover, "any permit or license denial, no matter how unattractive, that falls short of being 'truly horrendous' is unlikely to qualify as conscience-shocking."   <u>Id.</u> (quotation omitted) (affirming dismissal where allegations that Town and officials sought to put tavern out of business by denying liquor license were conclusory).

Accordingly, Plaintiffs must allege conduct that is "truly horrendous," which here they have not.  See Harron, 660 F. 3d at 536.  Even as alleged, Plaintiffs describe, at best, animosity between them, their competitors, and the Town, but no conduct that could meet the high bar required here.  For example, Plaintiffs state that Plaintiff Brackett was not considered for a position on the now-disbanded ad-hoc noise committee but fail to allege that the committee took any action against Plaintiffs.  See D. 37 ¶ 37.  Plaintiffs also assert, in conclusory fashion, that the noise complaints and subsequent investigation into and discipline for same were biased and erroneous, see id. ¶¶ 69-79, but the amended complaint does not allege any specific facts as to these complaints or investigations into same such that the Court can infer the unlawful conduct asserted here.  Moreover, Plaintiffs' licenses were eventually granted in April and May, despite allegedly improper delay.  Id. ¶ 116, 120-21.  To the extent that such delay was in violation of state law, even that cannot sustain a claim for conscience-shocking conduct.  See Baker v. Coxe, 940 F. Supp. 409, 415-16 (D. Mass. 1996), aff'd, 230 F.3d 470 (1st Cir. 2000) (noting "[i]t is not enough to show that [board] 'exceeded, abused or 'distorted' its legal authority'").

b)      Procedural Due Process

The Court does not read Plaintiffs' opposition to address Defendants' procedural due process arguments, see D. 65 at 12-18, but briefly addresses them for the sake of completeness. To plausibly allege a procedural due process claim, Plaintiffs "must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [them] of that interest without constitutionally adequate process."  González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (internal citation and quotation marks omitted).  For such claim, Plaintiffs would also need to show that Massachusetts law did not provide them with an adequate post-deprivation remedy.  Hadfield v. McDonough, 407 F.3d 11, 21 (1st Cir. 2005).  "Post-deprivation

remedies have been deemed sufficient (and fatal to a procedural due process claim) even where 'relief might be delayed, and damages are unavailable.'" Brockton Power LLC, 948 F. Supp. 2d at 67 (quoting Licari v. Ferruzzi, 22 F.3d 344, 348 (1st Cir. 1994)).  Here, Plaintiffs have availed themselves of post-deprivation remedies provided by statute, bringing multiple state court lawsuits following the Board's delay in renewing the licenses (pursuant to Mass. Gen. L. c. 249, § 4) and filed an appeal with the ABCC regarding same (pursuant to Mass. Gen. L. c. 138, § 67).  See Burnham v. City of Salem, Mass., 101 F. Supp. 2d 26, 35 (D. Mass. 2000) (noting that "[s]hould any doubt exist as to the adequacies of Massachusetts' post-deprivation remedies, it is answered by" Massachusetts law providing for an appeal, "to which [plaintiff] in fact appealed").

c)   <u>Equal Protection</u>

Plaintiffs assert an equal protection claim, premised on a "class of one" theory, alleging that the Town treated other restaurants on more favorable terms.  See D. 65 at 18; Rectrix Aerodome Centers, Inc. v. Barnstable Mun. Airport Comm'n, 632 F. Supp. 2d 120, 128 (D. Mass. 2009), aff'd, 610 F.3d 8 (1st Cir. 2010).  A class of one equal protection claim is "cognizable when—and only when—a 'plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)).  Therefore, Plaintiffs must "identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." Buchanan v. Maine, 469 F.3d 158, 178 (1st Cir. 2006) (citation and internal quotation marks omitted) (alteration in original).

Here, Plaintiffs have failed to allege sufficient facts about other restaurants to show that they were similarly situated, either as an establishment, as to complaints that had been filed against them, or as to how the Town treated them.  Plaintiffs merely list other licensed establishments in the Town that allegedly faced no discipline for similar conduct, but do not allege any facts about these businesses size and structure, whether residents had reported violations to the Harwich Police regarding noise or COVID-19 guidance, previous violations (save for Perks), or the specific circumstances of the alleged violations charged to each establishment, if any.  See D. 37 ¶ 77 (listing other businesses and lack of discipline), ¶ 91 (noting that Perks received one day suspension of entertainment license but admitting that it had only two confirmed Ordinance violations in 2019 and not providing details of prior discipline served), ¶ 96 (asserting that other establishments had their licenses renewed in February 2021 but not naming any except Perks); Clark v. Boscher, 514 F.3d 107, 114 (1st Cir. 2008) (affirming dismissal of equal protection claim brought by developers of residential subdivision dismissed where developers presented the court multitude of different types of allegedly comparable developments because they were not objectively similar in "all relevant respects"); Najas Realty, LLC v. Seekonk Water Dist., 68 F. Supp. 3d 246, 257 (D. Mass. 2014), aff'd, 821 F.3d 134 (1st Cir. 2016) (dismissing equal protection claim where complaint did not include "facts from which the court [could] determine whether these alleged 'comparables' are in any way similar to the plaintiffs'").  As such, Plaintiffs' allegations, even assumed to be true, do not plausibly allege comparators, a necessary predicate for this type of equal protection claim.

Accordingly, Plaintiffs have not plausibly stated Fourteenth Amendment claims.[9]

---

[9] To the extent that the Town also moves to dismiss the constitutional claims on qualified immunity grounds, see D. 59 at 17-19, the Court need not reach the issue in light of its dismissal on other grounds.

B.     **MCRA Claims (Count II)**

Defendants argue that the MCRA claims should be dismissed because there is no allegation that they acted through threats, intimidation or coercion.  D. 59 at 22.  "To establish a claim under the [MCRA], the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion."  Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 395 (1996) (citation and internal quotation marks omitted) (citing Mass. Gen. L. c. 12, § 11I).  "'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm."  Planned Parenthood League of Massachusetts. Inc. v. Blake, 417 Mass. 467, 474 (1994) (citations omitted).  "Intimidation," meanwhile, "involves putting in fear for the purpose of compelling or deterring conduct."  Id.    Finally, "coercion" amounts to "the use of physical or moral force to compel [another] to act or assent."  Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 565 (1995).  Here, the complaint is devoid of specific allegations as to Plaintiffs' fear of harm, or fear such that they felt compelled or deterred from any conduct, or that Defendants exhibited any use of force.  Instead, the complaint contains conclusory assertions that Plaintiffs were subjected to allegedly wrongful conduct here, which is itself insufficient to support the MCRA claim.  See, e.g., D. 37 ¶¶ 125, 150; Longval v. Comm'r of Correction, 404 Mass. 325, 333 (1989) (noting that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]").

Accordingly, Plaintiffs have failed to state a claim for violation of the MCRA.

C.      **Massachusetts Declaration of Rights (Count III)**

Defendants argue that the Court should dismiss Count III, which alleges a deprivation of rights guaranteed by the Massachusetts Declaration of Rights in the Massachusetts Constitution because there is no provide right of action for violations of these rights. D. 59 at 23. It is generally accepted that MCRA "occup[ies] the field" under most circumstances, Martino v. Hogan, 37 Mass. App. Ct. 710, 720 (1994), leaving no other recourse for an individual to assert a state constitutional claim against a state actor. The Supreme Judicial Court has noted in dicta that "a person whose constitutional rights have been interfered with may be entitled to judicial relief even in the absence of a statute providing a procedural vehicle for obtaining relief." Phillips v. Youth Dev. Program, Inc., 390 Mass. 652, 657–58 (1983); see also Layne v. Superintendent, Mass. Corr. Inst., Cedar Junction, 406 Mass. 156, 159–60 (1989) (finding constitutional claim moot, but noting that "a State may not violate a person's constitutional rights and then fairly assert that no redress can be had because the State has not provided a statutory means of enforcing those rights"). In addition, "[a]t least one justice of the Superior Court has also indicated that claims brought directly under the Declaration of Rights should be permitted." Parsons ex rel. Parsons v. Town of Tewksbury, No. 09–1595, 2010 WL 1544470, at *5 (Mass. Super. Jan. 19, 2010) (citing McClure v. East Brookfield, No. 97–2004, 1999 WL 1323628, at *2 (Mass. Super. Mar. 11, 1999)). The dicta in Layne, however, and those cases citing it aim to address harms that have no statutory redress. Here, the MCRA provides a means to sue a state actor for constitutional violations, provided that the actor uses threats, intimidation or coercion. See Grubba v. Bay State Abrasives, Div. of Dresser Indus., Inc., 803 F.2d 746, 748 (1st Cir. 1986) (noting that the MCRA was "a fully adequate procedural vehicle" to redress constitutional deprivations); see also Pimentel v. City of Methuen, 323 F. Supp. 3d 255, 274 (D. Mass. 2018) (denying right of action for same reasons and noting

that "[n]o Massachusetts appellate court, in the 35 years since <u>Phillips</u>, has ever held that such a right exists").

Accordingly, the Court allows the motion to dismiss as to Count III.

### D.   <u>Interference with Contractual Relations (Count IV)</u>

To prevail on a claim for interference with contractual or economic relations, Plaintiffs must establish that:  "(1) [they] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) [Plaintiffs were] harmed by the defendant's actions." <u>Psy-Ed Corp. v. Klein</u>, 459 Mass. 697, 715–16 (2011) (citation omitted).  Plaintiffs point to three instances of such interference:  the loss of The Port's chef, the loss of its outdoor tent deposit, and the loss of wedding reception deposits.  D. 65 at 26.  Here, Plaintiffs fail to allege that Defendants were aware of any of these relationships or that Defendants knowingly induced these third parties to break their agreements.  As to loss of the chef, the Court is unable to discern what specific intentional interference allegedly occurred as Plaintiffs allege only that the "loss of their chef and other valuable employees" was caused by Defendants' "disparate treatment and defamatory statements." <u>See</u> D. 37 ¶ 124.  As to Plaintiffs' assertion that they lost their tent deposit and deposits on wedding reservations, there is likewise no allegation that the Town was aware of such contracts, or that the Town intentionally interfered with them.  <u>See</u> D. 37 ¶ 118.  Accordingly, Count IV fails to state a claim.

### E.   <u>Common Law Conspiracy (Count V)</u>

"Two types of civil conspiracy exist under Massachusetts law.  The first 'requires proof of coercion; the second requires proof of a common plan to commit a tortious act.'" <u>Fiorillo v. Winiker</u>, 85 F. Supp. 3d 565, 576 (D. Mass. 2015) (quoting <u>Kurker v. Hill</u>, 44 Mass. App. Ct. 184,

188 (1998)).  "Under the first type of conspiracy, a plaintiff 'must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.'"  Id.  (internal citation omitted).  "For the second type of conspiracy, the plaintiff must allege 'first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement.'"  Id. (internal citation omitted).  Plaintiffs have failed to allege either form of civil conspiracy.  First, Plaintiffs do not allege that Defendants had "peculiar power of coercion" over them, but rather name individuals that "held a peculiar power of coercion of influence over the Board" to influence its decisions regarding Plaintiffs' licenses. See D. 37 ¶ 149.  The complaint is otherwise devoid of any facts that allege coercion or control over Plaintiffs outside of the Board's regular business of considering licenses and holding hearings for discipline on same.  See Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 244 (D. Mass. 1999) (noting that first type of civil conspiracy applies to "remedy direct economic coercion").  Second, there is no plausible allegation of tortious acts committed by these named individuals in furtherance of any agreement.  The only tort alleged here, as discussed above, fails to state a claim.  Plaintiffs point to anonymous social media accounts and internal non-public memoranda of the Town to argue that "a reasonable person might draw an inference of a common plan to commit, assist or encourage a tortious act on the part of two or more defendants."  D. 65 at 27.  That argument, however, overlooks the need for an "underlying tortious conduct for which liability can be assigned," and here there is no such conduct and no nexus to individuals for same.  See Massachusetts Laborers' Health & Welfare Fund, 62 F. Supp. 2d at 244.

F.     **Defamation (Count VI)**

"To prevail on a defamation claim, a plaintiff must 'establish that the defendants published a false statement about him to a third party that either caused him economic loss or was the type that is actionable without proof of economic loss.'" Driscoll v. Bd. of Trs. of Milton Acad., 70 Mass. App. Ct. 285, 295-96 (2007) (quoting Phelan v. May Dept. Stores Co., 443 Mass. 52, 55-56 (2004)).  Relevant here, Plaintiffs identify two alleged instances of defamation.  First, Plaintiffs allege that Sluis falsely reported to Harwich Police that Plaintiffs violated COVID-19 guidance. D. 37 ¶ 195.  Second, Plaintiffs allege that Ballantine made a defamatory statement to the Cape Cod Times, where he stated with regard to Plaintiffs' alleged violations of the guidance, "Our feeling is this was very flagrant. They ignored the whole of COVID-19 regulations." Id. ¶ 197.[10]

Plaintiffs have failed to state a defamation claim against Sluis.  "To properly allege defamation, a plaintiff must specifically identify the allegedly false statement," and "allegation[s] that the defendant made statements that 'cast the plaintiff in a negative light,' but that does not identify a specific statement, is not sufficient."  Kelleher v. Lowell Gen. Hosp., 98 Mass. App. Ct. 49, 53 n.2 (2020) (citation omitted).  Here, the single paragraph in the amended complaint that mentions Sluis' call to Harwich Police does not identify the objectionable statement, or any details about same such that the Court could assess the truth or falsity of the statement.[11]  See D. 37 ¶ 195;

---

[10] Plaintiffs suggest that the statements are defamation *per se* because they accuse Plaintiffs of committing a crime, see D. 65 at 28, but even as alleged these instances refer to alleged violations of state and local COVID-19 guidance for restaurants, not criminal laws.

[11] Plaintiffs have included the purported transcript of Sluis's call to Harwich police in the text of their opposition.  The Court, however, "may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment," and Plaintiffs have not argued that they meet one of the limited exceptions to this rule.  See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).

Piccone v. Bartels, 785 F.3d 766, 772 (1st Cir. 2015) (explaining that court's inquiry as to verifiable facts requires consideration of the "specific challenged statements" made).

As to Ballantine, Defendants argue that the statement is conditionally privileged.  D. 59 at 28.  "Statements made by public officials while performing their official duties are conditionally privileged [because] threat of defamation suits may deter public officials from complying with their official duties when those duties include the need to make statements on important public issues."  Barrows v. Wareham Fire Dist., 82 Mass. App. Ct. 623, 630–31 (2012) (quoting Mulgrew v. Taunton, 410 Mass. 631, 635 (1991)).  Here, Ballantine commented to the newspaper, identified as Chair of the Board, discussing ongoing matters related to a public Board hearing, and regarding Plaintiffs' compliance with COVID-19 restrictions subject to discussion at same.   D. 37-27 at 1-2.  Plaintiffs do not contend with this argument but note that "despite the qualified privilege" it can be lost by a showing that Ballantine abused the privilege, such as "publication with knowledge of falsity or with reckless disregard of the truth."  See D. 65 at 28-30; Barrows, 82 Mass. App. Ct. at 631.  Plaintiffs do not specify how Ballantine knew the statement was false or that he acted with reckless disregard.  See D. 65 at 30.  In their amended complaint, Plaintiffs assert that Ballantine "kn[ew] that Meggan Eldredge, Harwich Health Agent, inspected and approved Ember's and The Port's operations as compliant with COVID-19 guidance, as such was required to permit each licensed establishment's 'outdoor' operations."  D. 37 ¶ 197.  Even if he did have knowledge of Eldredge's inspection and approval of their operations plans, that does not speak to the subsequent alleged violations of the COVID-19 guidance described by Ballantine and under consideration by the Board for discipline.

For at least the reasons discussed above, Plaintiffs have failed to state a defamation claim against Sluis and Ballantine.

## VI.   Conclusion

For these reasons, the Court ALLOWS the motions to dismiss. [12]

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[12] The Court also dismisses the amended complaint against Does 1-10.  To sue an unidentified party, a plaintiff must "show that 'a good-faith investigation has failed to reveal the identity of the relevant defendant and there is a reasonable likelihood that discovery will provide that information.'"  Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 58 n.6 (1st Cir. 2013) (quoting Martínez–Rivera v. Sánchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007)).  As alleged, Plaintiffs' amended complaint offers no information to assess same.  See D. 37 ¶ 32 (alleging only that Does 1-10 "are individuals whose actual names remain unknown after completion of a reasonable and diligent search"); Messere v. Clarke, No. 11-cv-11705-MLW, 2015 WL 5609959, at *14 (D. Mass. Sept. 22, 2015) (dismissing Doe defendants for same).