UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| 3137, LLC, 541 MAIN STREET REALTY TRUST, EMBER PIZZA, INC., THE PORT RESTAURANT AND BAR, INC., JUSTIN R. BRACKETT, and JARED G. BRACKETT,<br><br>Plaintiffs,<br><br>v.<br><br>TOWN OF HARWICH, et al.,<br><br>Defendants. | Case No. 21-cv-10473-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                     **March 15, 2023**

**I.     Introduction**

Plaintiffs 3137, LLC, 541 Main Street Realty Trust, Ember Pizza, Inc. ("Ember"), The Port Restaurant and Bar, Inc. ("The Port"), Justin R. Brackett and Jared G. Brackett (collectively, "Plaintiffs") have filed this lawsuit against Defendants Town of Harwich, Joseph F. Powers, David J. Guillemette, Kevin M. Considine, Michael D. Macaskill, Larry G. Ballantine, Donald F. Howell, Edward J. McManus, Stephen P. Ford[1] (collectively, "Town"), Gail O. Sluis ("Sluis"), Patricia A. O'Neill ("O'Neill"), and Does 1–10 (collectively, "Defendants"), asserting violations of their First and Fourteenth Amendment rights (Count I), state constitutional rights (Counts II and III),[2] intentional interference with contractual and economic relations (Count IV), common law

---

[1] Defendants notified the Court that Stephen P. Ford passed away on April 9, 2021. D. 26.

[2] Count III alleges a deprivation of rights guaranteed by the Massachusetts Declaration of Rights in the Massachusetts Constitution only against the Town. D. 37 ¶¶ 176–82.

1

conspiracy (Count V) and defamation (Count VI) in connection with the Town's enforcement of its Noise Ordinance ("Ordinance") and the state's COVID-19 restrictions. D. 37. The Town and Sluis moved to dismiss, D. 58; D. 60, which the Court granted, D. 75, dismissing those Defendants and Defendants Does 1-10, id. at 21 n.12. What remains is O'Neill's motion for judgment on the pleadings, D. 85, and the Plaintiffs' second cross-motion for leave to amend the amended complaint, D. 88. For the foregoing reasons, the Court ALLOWS O'Neill's motion for judgment on the pleadings and DENIES the Plaintiffs' second cross-motion to amend.

## II. Standard of Review

### A. Motion for Judgment on the Pleadings

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion. Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006) (citing cases). To survive a motion for judgment on the pleadings, therefore, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Because a motion for judgment on the pleadings "'calls for an assessment of the merits of the case at an embryonic stage,'" the Court "'view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom'" in their favor. Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (quoting R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006)).

On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings, including the answer. See Aponte-Torres, 445 F.3d at 54–55 (citing 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1368 (3d ed. 2004)). Those assertions in the

answer that contradict the complaint are treated as false. Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010) (citing cases). In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp., 446 F.3d at 182 (citing In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15–16 (1st Cir. 2003)).

**B.     Motion to Amend the Complaint**

Rule 15(a) "mandates that leave to amend is to be 'freely given when justice so requires' . . . unless the amendment 'would be futile, or reward, *inter alia*, undue or intended delay.'" Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) (quoting Fed. R. Civ. P. 15(a)(2) and Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994)). Rule 15(a)'s "liberal amendment policy . . . does not mean that leave will be granted in all cases." Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 51 (1st Cir. 1998) (quoting 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487, at 611 (2d ed. 1990)). "[I]f the proposed amendment would be futile because, as thus amended, the complaint still fails to state a claim, the district court acts within its discretion in denying the motion to amend." Boston & Me. Corp. v. Town of Hampton, 987 F.2d 855, 868 (1st Cir. 1993) (citing cases), overruled on other grounds, Educadores Puertorriqueños en Acción v. Hernandez, 367 F.3d 61 (1st Cir. 2004).

**III.    Factual Background**

The Court incorporates by reference the alleged facts articulated in its January 28, 2022 Memorandum and Order on the Town's and Sluis' motions to dismiss, D. 75, and recites here only those particular allegations that pertain to O'Neill. These facts are drawn from the amended complaint, D. 37, and documents referenced therein.

The amended complaint contains only two paragraphs with facts specifically about O'Neill. First, O'Neill is an individual who resides in Harwich Port, Massachusetts. D. 37 ¶ 31. Second, on several occasions during the summer of 2020, while O'Neill was living in Florida, the Plaintiffs allege she falsely reported Plaintiffs' violations of their liquor and entertainment licenses and COVID-19 guidance to the Massachusetts Department of Labor Standards and the Harwich Health Agent. Id. ¶ 196. Besides these two paragraphs, the Plaintiffs generally allege throughout the amended complaint that O'Neill participated in a conspiracy with the other Defendants to "harass, cyberstalk, defame and threaten the Plaintiffs, including over social media" and to weaponize the Ordinance "to malign and take down Ember and The Port by selectively targeting each and interfering with and/or depriving them of their property rights in each establishment's licenses." Id. ¶¶ 85, 150; see id. ¶¶ 6, 109, 190.

## IV.     Procedural History

Plaintiffs initiated this lawsuit on March 19, 2021. D. 1. After the Plaintiffs amended their complaint, D. 37, the Town and Sluis moved to dismiss, D. 58; D. 60. The Court heard the parties on the pending motions and granted the motions on January 28, 2022. D. 75. As O'Neill failed to timely file a responsive pleading, the Plaintiffs moved for entry of default against her on March 2, 2022. D. 77. O'Neill filed an answer the same day as Plaintiffs' motion, D. 78, and the Court denied Plaintiffs' motion for entry of default, D. 77, against O'Neill, D. 90. Now before the Court is O'Neill's motion for judgment on the pleadings, D. 85, and Plaintiffs' cross motion to amend filed in their opposition, D. 88.

V. **Discussion**

    A. <u>**Motion for Judgment on the Pleadings**</u>

        *1.  Adjudication of the Motion Is Proper*

Before proceeding to the merits of O'Neill's motion for judgment on the pleadings, Plaintiffs argue that the Court is required to deny the motion because in her answer she "denie[d] every allegation of the Amended Complaint except one" regarding her present-day address. D. 88 at 3–4. Relying on <u>Aponte-Torres</u>, in which the First Circuit stated, "[l]ike Rule 12(b)(6), Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment," <u>Aponte-Torres</u>, 445 F.3d at 54 (citing <u>Rivera-Gomez v. De Castro</u>, 843 F.2d 631, 635 (1st Cir. 1988)), Plaintiffs contend that granting the motion would be improper because the facts here are contested.

As an initial matter, however, the Court notes that O'Neill did not deny every allegation of the amended complaint; rather, she stated she was without knowledge of the vast majority of facts alleged in the amended complaint. <u>See</u> <u>generally</u> D. 78. Of the 198 paragraphs of the amended complaint, only seven paragraphs specifically reference O'Neill. D. 37 ¶¶ 6, 31, 85, 109, 150, 190, 196. Each of these paragraphs was denied to the extent it was an allegation against O'Neill, except for the paragraph detailing her address. D. 78 ¶¶ 6, 31 (alleging her address which she admits), 85, 109, 150, 190, 196. Of the six paragraphs O'Neill denied, four include no "specific, nonconclusory factual allegations;" instead, they include only "conclusory statements," which "under Rule 12(c), courts need not credit." <u>Class v. Puerto Rico</u>, 309 F. Supp. 2d 235, 236 (D.P.R. 2004) (citing cases); <u>see</u> <u>Soto-Torres v. Fraticelli</u>, 654 F.3d 153, 158–59 (1st Cir. 2011); D. 37 ¶ 6 (alleging that "[u]pon information and belief, and as part of a conspiracy targeting Plaintiffs, each

5

of the members of the Board, the Town Administrator, the Chief of Police and the Deputy Chief of Police engaged in ex-parte communications with one another and . . . other influential neighbors, including Patricia A. O'Neill"); id. ¶ 109 (alleging that "[u]pon information and belief, an[d] in retaliation for filing this action and 'to make a point,' the Town Defendants invoked the Rule of Necessity solely to drag Plaintiffs through a series of non-statutory and unconstitutional public hearings designed solely to harass, threaten and publicly shame Plaintiffs by hosting a 'parade of horribles' and soliciting embarrassing public testimony from a selectively-curated group of influential neighbors hostile to Plaintiffs.  In particular, and as part of a conspiracy targeting Plaintiffs, each of the members of the Board, the Town Administrator, the Chief of Police and the Deputy Chief of Police engaged in ex-parte communications with one another and . . . other influential neighbors, including Patricia A. O'Neill"); id. ¶ 150 (alleging that "MacAskill, Powers, Guillemette and Powers, acting in concert with others, including without limitation . . . O'Neill, held a common design and agreement to invoke the unconstitutional Noise Bylaw and ever-changing COVID-19 guidance to malign and take down Ember and The Port by selectively targeting each and interfering with and/or depriving them of their property rights in each establishment's licenses, and took necessary steps in furtherance thereof, including by harassing Plaintiffs, by making false complaints, by making not-so-veiled threats and acts of intimidation and coercion ('good luck' and 'told you we were watching you'), including by referring unsubstantiated violations for discipline, providing self-serving testimony in support thereof, failing to provide exculpatory testimony rebutting the unsubstantiated violations, and wielding their influence over the Board to secure discipline in violation of Plaintiffs' rights, in such a manner so inspired by malice that it shocks the conscience as it was intended to injure Plaintiffs in a way unjustifiable by any government interest"); id. ¶ 190 (alleging that "MacAskill, Powers,

Guillemette and Powers, acting in concert with others, including without limitation . . . O'Neill, held a common design and agreement to invoke the unconstitutional Noise Bylaw and ever-changing COVID-19 guidance to malign and take down Ember and The Port by selectively targeting each and interfering with and/or depriving them of their property rights in each establishment's licenses, and took necessary steps in furtherance thereof, including by harassing Plaintiffs, by making false complaints, by making not-so-veiled threats and acts of intimidation and coercion ('good luck' and 'told you we were watching you'), including by referring unsubstantiated violations for discipline, providing self-serving testimony in support thereof, failing to provide exculpatory testimony rebutting the unsubstantiated violations, and wielding their influence over the Board to secure discipline in violation of Plaintiffs' rights, in such a manner so inspired by malice that it shocks the conscience as it was intended to injure Plaintiffs in a way unjustifiable by any government interest"). None of these allegations make specific, non-conclusory allegations regarding any allegedly wrongful conduct by O'Neill. Even paragraph 85, which at least arguably gives more specifics about the conduct of others, is still not specific about any wrongful conduct by O'Neill. D. 37 ¶ 85 (alleging that "[u]pon information and belief, MacAskill and others are abusing his authority and trading on confidential information for private or political purposes. For example, internal, non-public Town memoranda and information about Ember and The Port – known only to the Board and the Town – have been released to certain individuals, including O'Neill, . . . with the direction and understanding that the recipients use the information to harass, cyberstalk, defame and threaten the Plaintiffs, including over social media. Indeed, 'anonymous' social media posts include copies of non-public, 'internal' Town memoranda, . . . and posts referencing the veiled threat: 'Told you we are paying attention'").

7

While paragraph 85 alleges that certain documents were given to O'Neill, it does not allege she did anything with that information that amounts to wrongful conduct.

The only remaining paragraph from the amended complaint, which O'Neill denied in her answer, alleges that:

> [o]n numerous occasions throughout the summer of 2020, O'Neill, individually and posing as others, falsely claimed to the Massachusetts Department of Labor Standards and the Harwich Health Agent that she had witnessed violations by Plaintiffs of their liquor and entertainment licenses and COVID-19 guidance when she then residing [sic] in Florida. O'Neill knew her statements to be false (or made such statements with reckless disregard for the statement's truth or falsity) and made such statements with the intent to cause Plaintiffs to suffer economic harm.

D. 37 ¶ 196. To begin, this paragraph was only incorporated into the defamation claim (Count VI) and not incorporated by reference into the other counts against O'Neill. Id. ¶¶ 194–98. Even assuming that it was so incorporated, the paragraph does not set forth "specific, nonconclusory factual allegations regarding each material element necessary to sustain recovery." Class, 309 F. Supp. 2d at 236 (citing cases). Certainly, in adjudicating a Rule 12(c) motion, the First Circuit has cautioned: "[s]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross "the line between the conclusory and the factual.'" Soto-Torres, 654 F.3d at 159 (quoting Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011)). Following the First Circuit's warning, this Court finds the paragraph "'threadbare'" and "'speculative,'" as it does not include any specific information about what exactly O'Neill said, which aspects of the licenses or COVID-19 guidance the Plaintiffs supposedly violated, how she knew the alleged violations did not occur, or any other "material element necessary to sustain recovery." Id. (quoting Peñalbert-Rosa, 631 F.3d at 595); Class, 309 F. Supp. 2d at 236 (citing cases).

Even assuming, *arguendo*, that this paragraph alleged sufficiently specific, nonconclusory factual allegations regarding the material elements necessary to sustain recovery, this Court is not engaging in the "resolution of contested facts." Aponte-Torres, 445 F.3d at 54 (citing Rivera-Gomez, 843 F.2d at 635). Instead, as evidenced by its analysis below as to each of the claims against O'Neill, the Court is crediting "all of the allegations of the non-moving party . . . as true," for purposes of adjudicating the motion. Salform Inc. v. Anvil Int'l, LLC, No. 19-cv-796-LM, 2020 WL 4340274, at *3 (D.N.H. July 28, 2020) (citing Villeneuve v. Avon Prod., Inc., 919 F.3d 40, 49 (1st Cir. 2019)).

Accordingly, to the extent that Plaintiffs were seeking denial of the motion for judgment on the pleadings due to the denials in O'Neill's answer, such denial is not warranted.

        2.       *Constitutional Claims (Count I)*

Plaintiffs assert Count I against O'Neill for alleged violations of their First and Fourteenth Amendment rights, pursuant to 42 U.S.C. §§ 1983 and 1985.

Plaintiffs' § 1983 claim against O'Neill fails because the amended complaint does not allege the necessary predicate that O'Neill, a private citizen, acted "under color of law." See Davignon v. Hodgson, 524 F.3d 91, 112 (1st Cir. 2008). Nevertheless, Plaintiffs argue that, when "combined with the assistance or participation of the Town defendants," O'Neill's actions can constitute state action as required for a § 1983 claim. D. 88 at 9 (citing, *inter alia*, Lugar v. Edmondson Oil Co., 457 U.S. 922, 939–42 (1982)). The amended complaint, however, alleges no facts that O'Neill acted in concert with the Town defendants. The amended complaint includes generalized allegations against O'Neill, including that "internal, non-public Town memoranda and information about Ember and The Port – known only to the Board and the Town – have been released to certain individuals, including O'Neill . . . with the direction and understanding that the

9

recipients use the information to harass, cyberstalk, defame and threaten the Plaintiffs, including over social media" and "as part of a conspiracy targeting Plaintiffs, each of the members of the Board, the Town Administrator, the Chief of Police and the Deputy Chief of Police engaged in ex-parte communications with one another and . . . Patricia A. O'Neill . . . ." D. 37 ¶¶ 85, 109.  But these generalized allegations include no supporting, specific facts implicating O'Neill.  No actions by O'Neill are alleged following these alleged directions to harass, cyberstalk, defame and threaten the Plaintiffs, and no actions were attributed to O'Neill following the alleged *ex parte* communications.  See Glaros v. Perse, 628 F.2d 679, 684–85 (1st Cir. 1980) (affirming dismissal of § 1983 claims against private individuals because, among other reasons, "[a]part from conclusory statements that all defendants acted under color of law, and generalized allegations of conspiracy between all defendants, there was only the allegation that the individual private defendants 'cooperated in the surveillance of plaintiff on the request of government agencies,'" which does not "make out a claim of action taken under color of state law"); Tynecki v. Tufts Univ. Sch. of Dental Med., 875 F. Supp. 26, 30 (D. Mass. 1994) (dismissing § 1983 claim because the complaint only alleged "that the defendants violated the plaintiff's rights 'under color of state law,'" but "contain[ed] no factual support therefore").

Plaintiffs' § 1985 claim also fails to state a claim because "a plaintiff may recover only when the conspiratorial conduct of which he complains is propelled by some racial, or perhaps otherwise class-based, invidiously discriminatory animus," Perkins v. City of Attleboro, 969 F. Supp. 2d 158, 178 (D. Mass. 2013) (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)) (internal quotation marks omitted), and here Plaintiffs do not allege racial or class-based discrimination.

10

Accordingly, Plaintiffs have not plausibly stated a First Amendment or Fourteenth Amendment claim against O'Neill.

### 3. *Massachusetts Civil Rights Act ("MCRA") (Count II)*

O'Neill argues that the MCRA claim against her fails because there is no allegation that she threatened, intimidated, or coerced any of the Plaintiffs into relinquishing their constitutional rights. D. 86 at 11. "To establish a claim under the [MCRA], the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 395 (1996) (citing Mass. Gen. L. c. 12, § 11I) (citation and internal quotation marks omitted). Plaintiffs acknowledge that violations of the MCRA frequently involve an "actual or potential physical confrontation accompanied by a threat of harm," but contend "economic coercion, standing alone, may be actionable under the MCRA." D. 88 at 13 (citing Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 473 (1994), and Buster v. George W. Moore, Inc., 438 Mass. 635, 647–48 (2003)) (internal quotation marks omitted). While it is true that it remains possible "in certain circumstances" for economic coercion "to be actionable under the [MCRA]," Buster, 438 Mass. at 648, Plaintiffs' amended complaint is devoid of allegations that O'Neill engaged in economic coercion, that Plaintiffs feared economic harm specifically caused by O'Neill, or that Plaintiffs refrained from any conduct because of her specific actions. Indeed, the only allegations against O'Neill are that she received a nonpublic Town memorandum and that she had *ex parte* communications with the Town defendants. D. 37 ¶¶ 85, 109. Further, to the extent they could be viewed as threats, the specific "[g]ood luck" and "[t]old you we are paying attention" statements alleged in the amended complaint were not

attributed to O'Neill. D. 37 ¶¶ 64, 85. The amended complaint only contains conclusory assertions that Plaintiffs were subjected to actionable conduct here by O'Neill, which is insufficient to support the MCRA claim. See, e.g., D. 37 ¶ 109 (alleging that "as part of a conspiracy targeting Plaintiffs, each of the members of the Board, the Town Administrator, the Chief of Police and the Deputy Chief of Police engaged in ex-parte communications with one another and . . . other influential neighbors, including Patricia A. O'Neill"); id. ¶ 150 (alleging that certain defendants, including O'Neill, "held a common design and agreement to invoke the unconstitutional Noise Bylaw and ever-changing COVID-19 guidance to malign and take down Ember and The Port by selectively targeting each and interfering with and/or depriving them of their property rights in each establishment's licenses, and took necessary steps in furtherance thereof, including by harassing Plaintiffs, by making false complaints, by making not-so-veiled threats and acts of intimidation and coercion ('good luck' and 'told you we were watching you'), including by referring unsubstantiated violations for discipline, providing self-serving testimony in support thereof, failing to provide exculpatory testimony rebutting the unsubstantiated violations, and wielding their influence over the Board to secure discipline in violation of Plaintiffs' rights, in such a manner so inspired by malice that it shocks the conscience as it was intended to injure Plaintiffs in a way unjustifiable by any government interest"); Longval v. Comm'r of Corr., 404 Mass. 325, 333 (1989) (noting that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]" (citing Pheasant Ridge Assocs. Ltd. P'ship v. Burlington, 399 Mass. 771, 781 (1987))).

Accordingly, Plaintiffs have failed to state a claim against O'Neill for violation of the MCRA.

    4.    *Interference with Contractual Relations (Count IV)*

Count IV fails for the same reasons the Court stated in its January 28, 2022 Memorandum and Order. D. 75 at 17 (dismissing interference with contractual relations claim because Plaintiffs failed to allege that Defendants were aware of any specific contractual relationship or knowingly induced third parties to break their contractual relationships with Plaintiffs). Plaintiffs fail to allege the necessary components for an interference with contractual relations claim as to O'Neill, including that she was aware of Plaintiff's business relationships with particular third parties or that she knowingly induced those third parties to break their agreements. The Court incorporates by reference that analysis of Count IV and allows the motion for judgment on the pleadings as to Count IV.

### 5. *Common Law Conspiracy (Count V)*

"Two types of civil conspiracy exist under Massachusetts law. The first 'requires proof of coercion; the second requires proof of a common plan to commit a tortious act.'" Fiorillo v. Winiker, 85 F. Supp. 3d 565, 576 (D. Mass. 2015) (quoting Kurker v. Hill, 44 Mass. App. Ct. 184, 188–89 (1998)). "Under the first type of conspiracy, a plaintiff 'must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.'" Id. (quoting Aetna Casualty Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994)). "For the second type of conspiracy, the plaintiff must allege 'first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement.'" Id. (quoting Aetna Casualty Sur. Co., 43 F.3d at 1564).

O'Neill argues that the amended complaint contains no factual allegations of her involvement in a conspiracy, of any power of coercion she had over Plaintiffs, or of any affirmative actions on her part in furtherance of the conspiracy. D. 86 at 14–15. Plaintiffs do not address

13

these arguments in their opposition and instead challenge this Court's reasoning from its January 28, 2022 Memorandum and Order, dismissing Count V against the Town and Sluis. D. 88 at 15–17. The Court previously dismissed Count V against the other defendants because Plaintiffs did not allege that those Defendants had any "peculiar power of coercion" over them, and Plaintiffs did not allege any tortious acts committed in furtherance of any agreement. D. 75 at 18. Here, Plaintiffs argue that O'Neill exhibited a "peculiar power of coercion" over them through her joint participation in state action with the Town defendants and that the underlying tortious act was "that the Board held a common plan to retaliate against Plaintiffs through economic coercion during a pandemic by breaching its statutory obligation to promptly renew Plaintiffs' entertainment and liquor licenses, and solicited and relied upon O'Neill's, Sluis's and others' substantial assistance (in providing false and malicious statements that Plaintiffs were violating COVID-19 guidance) to do so." D. 88 at 16. These arguments are unavailing because not only does this still fail to allege a specific tort, but, as discussed above, the amended complaint also contains no specific, nonconclusory factual allegations regarding O'Neill's joint participation in state action or exercise of economic coercion over Plaintiffs.

Plaintiffs next direct the Court's attention to two cases, Thomas v. Town of Salisbury, 134 F. Supp. 3d 633 (D. Mass. 2015), and The Patriot Group, LLC v. Edmands, 96 Mass. App. Ct. 478 (2019), D. 88 at 16–17, neither of which warrants a different outcome. First, in Thomas, the court ruled that plaintiffs had stated a claim for conspiracy, where they alleged defendants "acted in concert to inflict a wrong on Thomas by, among other things, initiating and orchestrating a flawed and biased investigation of Thomas." D. 88 at 16 (quoting Thomas, 134 F. Supp. 3d at 649). But the plaintiff in Thomas did much more than simply allege the aforementioned statement; he also alleged a series of other specific facts by the alleged co-conspirators, which the court found

14

sufficient. Thomas, 134 F. Supp. 3d at 650. Plaintiffs here have only alleged generalized statements of participation in a conspiracy, with no specific allegations of O'Neill's actions. Second, Plaintiffs argue that they are not required under Massachusetts law to proffer particularized allegations of O'Neill's knowledge or actual participation in the alleged conspiracy, relying upon The Patriot Group, LLC, 96 Mass. App. Ct. at 489. D. 88 at 17. While the Massachusetts Appeals Court noted there that "knowledge, like other conditions of mind, can be averred generally," it did not state that a defendant's participation in an alleged conspiracy can be averred generally. The Patriot Group, LLC, 96 Mass. App. Ct. at 489 (quoting Baker v. Wilmer Cutler Pickering Hale & Dorr, LLP, 91 Mass. App. Ct. 835, 849 (2017)) (internal quotation marks omitted). To the contrary, the plaintiff in The Patriot Group, LLC alleged facts about the defendant's specific actions taken in furtherance of the conspiracy, which Plaintiffs did not do here. Id.

Accordingly, Plaintiffs have not plausibly stated a conspiracy claim against O'Neill.

      6.     *Defamation (Count VI)*

"To prevail on a defamation claim, a plaintiff must 'establish that the defendants published a false statement about him to a third party that either caused him economic loss or was the type that is actionable without proof of economic loss.'" Driscoll v. Bd. of Trs. of Milton Acad., 70 Mass. App. Ct. 285, 295–96 (2007) (quoting Phelan v. May Dept. Stores Co., 443 Mass. 52, 55–56 (2004)). Plaintiffs allege that O'Neill falsely reported to the Massachusetts Department of Labor Standards and the Harwich Health Agent that she had witnessed Plaintiffs violate their liquor and entertainment licenses and COVID-19 guidance while she was living in Florida. D. 37 ¶ 196. Even assuming this is true, Plaintiffs have failed to state a defamation claim against O'Neill.

"To properly allege defamation, a plaintiff must specifically identify the allegedly false statement," and "allegation[s] that the defendant made statements that 'cast the plaintiff in a negative light,' but that do[] not identify a specific statement, [are] not sufficient." Kelleher v. Lowell Gen. Hosp., 98 Mass. App. Ct. 49, 53 n.2 (2020), rev. denied, 486 Mass. 1104 (2020) (internal citation omitted). Here, the single paragraph in the amended complaint that mentions O'Neill's reports to the Massachusetts Department of Labor Standards and the Harwich Health Agent do not identify her actual statement to those authorities, which violations Plaintiffs committed, or how O'Neill knew the violations did not occur. See D. 37 ¶ 196; Piccone v. Bartels, 785 F.3d 766, 772 (1st Cir. 2015) (explaining that a court's inquiry as to whether a statement is a verifiable fact or opinion requires consideration of the "specific challenged statements" made).

Plaintiffs contend, as they did in their opposition to the Town's and Sluis' motions to dismiss, that O'Neill's alleged statements are *per se* defamation because she accused Plaintiffs of violating criminal laws. The Court explained in its January 28, 2022 Memorandum and Order that, even as alleged, the statements in the amended complaint refer to violations of state and local COVID-19 guidance, not criminal laws. D. 75 at 19 n.10. Undeterred, Plaintiffs respond that "[t]his ignores the Plaintiffs' allegation that the Board has continuously maintained and wielded Governor Baker's COVID-19 Executive Orders as 'carrying the force of law,' the violation of which was an 'illegality' constituting a violation of 204 C.M.R. [§] 2. 05(2), and the very legal basis to host the Board's disciplinary proceedings." D. 88 at 18. But this does not change the fact that a violation of 204 C.M.R. § 2.05(2) is not a violation of a criminal law.

Plaintiffs further contend that the Fourteenth Amendment offers protection against a severely defamatory charge, where the defamation might seriously damage an individual's reputation or impose a stigma upon them. Id. They suggest that defamatory statements regarding

violations of COVID-19 guidance satisfy these criteria, Id. at 18–19, but it remains that the amended complaint does not sufficiently identify O'Neill's allegedly defamatory statements.

For at least the reasons articulated above, Plaintiffs have failed to state a defamation claim against O'Neill.

### B.     Second Motion for Leave to Amend

Plaintiffs seek leave to file a second amended complaint, D. 88, but this motion to amend suffers from the same defects as the first.  The Court denied Plaintiffs' first motion for leave to amend because they had "not specified any additional facts or claims they would include in a further amended complaint."  D. 91.  This same issue plagues the instant motion.

Throughout Plaintiffs' motion, they state that, if afforded the opportunity to file a second amended complaint, they will, among other things, (1) "allege additional facts supporting their claims that O'Neill . . . actively encouraged and w[as] [a] 'joint participant[]' in the Town's biased and selective enforcement of the Ordinance and COVID-19 guidance, and thus  acted under state law;" (2) "allege that O'Neill . . . privately communicated with the Town defendants and w[as] coached by them to make complaints that Plaintiffs were then violating COVID-19 guidance;" (3) "allege detailed facts concerning restaurants additional to Perks . . . including the establishment's size, location and operational licenses;" (4) "allege that O'Neill . . . because of extensive public outreach and news coverage of the ongoing COVID-19 pandemic, w[as] acutely aware of and perceived Plaintiffs' ongoing compliance with COVID-19 guidance as a 'social contract,' whereby publicly and falsely accusing Plaintiffs of noncompliance necessary causes existing and prospective customers to refuse to patronize Plaintiffs' restaurants;" (5) "allege that O'Neill, despite having never set foot in either restaurant during the pandemic, and having no personal knowledge thereof, is believed to be the owner and creator of dozens of false social media accounts

to allege and peddle spiteful and malicious allegations of noncompliance from the comfort of her Florida home;" (6) "allege additional facts concerning how O'Neill . . . knew [her] statements were false, or that [she] acted with reckless disregard of the falsity of such statements given that [she] was aware that the Board of Health . . . were at all times fully aware of the defendants' accusations of noncompliance and that the same were false or unfounded;" (7) "allege that Meggan Eldredge and other officials informed O'Neill . . . that such 'subsequent' violations were likewise false or unfounded." D. 88 at 10–11, 14–15, 19.  However, nowhere in their cross-motion do the Plaintiffs state what these new facts actually are.

Even more fatal to Plaintiffs' motion is the fact that, assuming all these proposed new allegations are true, they would not save any of their claims from dismissal.  For instance, Plaintiff's § 1983 claim against O'Neill would not survive a 12(b)(6) challenge because, even if these new facts demonstrated she acted under color of law when making false statements, to make out a successful § 1983 claim against O'Neill, Plaintiffs would still need to demonstrate that her actions violated a right secured by the Constitution and laws of the United States.  West v. Atkins, 487 U.S. 42, 48 (1988) (citing cases).  But Plaintiffs have alleged no additional facts regarding how O'Neill's alleged false statements led inexorably to a violation of their rights.  Alleging detailed facts "concerning restaurants additional to Perks . . . including the establishment's size, location and operational licenses" would also not make a difference to the Plaintiffs' additional constitutional claim.  D. 88 at 11.  As the Court explained in its January 28, 2022 Memorandum and Order, Plaintiffs would need to demonstrate other establishments are similarly situated in all respects, including "whether residents had reported violations to the Harwich Police regarding noise or COVID-19 guidance, previous violations (save for Perks), or the specific circumstances of the alleged violations charged to each establishment, if any." D. 75 at 14; see D. 37 ¶ 91 (noting

that Perks received a one day suspension of its entertainment license but admitting that it had only two confirmed Ordinance violations in 2019 and not providing details of prior discipline served). Plaintiffs have not alleged they would make such a showing. D. 88 at 11. This is particularly notable, where this litigation revolves around Defendants' alleged use of fabricated Ordinance violations and violations of COVID-19 guidance to target Plaintiffs.

Likewise, Plaintiffs' economic coercion claim under the MCRA would fail because, even if they demonstrated O'Neill was a joint participant in state action through her false statements, D. 88 at 13, they have still alleged no facts that they feared economic harm because of her and her false statements, that they refrained from any conduct because of her, or that these circumstances are of the limited, "certain circumstances" in which the Supreme Judicial Court envisioned economic coercion being actionable under the MCRA, Buster, 438 Mass. at 648. So, too, would Plaintiffs' tortious interference claim fail. Simply offering to "allege that O'Neill . . . because of extensive public outreach and news coverage of the ongoing COVID-19 pandemic, w[as] acutely aware of and perceived Plaintiffs' ongoing compliance with COVID-19 guidance as a 'social contract,' whereby publicly and falsely accusing Plaintiffs of noncompliance necessary causes existing and prospective customers to refuse to patronize Plaintiffs' restaurants" does nothing to satisfy the other necessary components of such a claim, including that O'Neill had knowledge of Plaintiff's business relationships with particular third parties, and how or if O'Neill knowingly induced those third parties to break their agreements D. 88 at 14.

Additionally, even assuming Plaintiffs sufficiently "allege additional facts establishing a common tortious plan involving O'Neill, . . . and the Town defendants, including that O'Neill . . . knowingly made false complaints to Town Defendants and the Department of Labor concerning violations of COVID-19 guidance, and w[as] even coached by the Town Defendants to provide

specific information as against Plaintiffs' restaurants, with the understanding that the Town Defendants would utilize those complaints to refuse to uphold their statutory obligation to promptly renew Plaintiffs' entertainment and liquor licenses," Plaintiffs' conspiracy claims cannot be resurrected from dismissal because they have yet to sufficiently allege an underlying tort. D. 88 at 17. The only torts alleged in the amended complaint are intentional interference with contractual relations and defamation. As described above, the tortious interference claim still fails, even assuming these new proposed allegations are true. Similarly, Plaintiffs' defamation claim fails because the new allegations fail to offer which exact statements O'Neill made to the Massachusetts Department of Labor Standards and the Harwich Health Agent or how those statements specifically caused Plaintiffs economic loss or was the type that is actionable without proof of economic loss—both necessary predicates to a defamation claim. See, e.g., Kelleher, 98 Mass. App. Ct. at 53 n.2 (internal citation omitted); Driscoll, 70 Mass. App. Ct. at 295–96 (2007) (quoting Phelan, 443 Mass. at 55–56).

Plaintiffs, therefore, have failed to show why amendment would not be futile, warranting denial of their second request to amend. See Aponte-Torres, 445 F.3d at 58; Monroe v. Medtronic, Inc., 511 F. Supp. 3d 26, 40 (D. Mass. 2021).

## VI. Conclusion

For these reasons, the Court ALLOWS the motion for judgment on the pleadings, D. 85, and DENIES the second motion for leave to amend, D. 88.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge